IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

HARRY OOTEN,                              )
          Plaintiff,                     )
                               )
v.                                        )          CIVIL ACTION NO. 3:15-06740
                               )
CAROLYN. W. COLVIN,                       )
Acting Commissioner of Social Security,   )
          Defendant.                     )

PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Orders entered July 22, 2015, and January 5, 2016 (Document Nos. 3 and 14.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings (Document Nos. 11 and 12.), and Plaintiff's Reply. (Document No. 13.)

The Plaintiff, Harry Ooten (hereinafter referred to as "Claimant"), filed an application for DIB on August 21, 2012, alleging disability as of September 30, 2010,[1] due to degenerative disc disease, acid reflux, mood disorder, numbness in legs, and an inability to read and write.[2] (Tr. at 12, 191, 192-98, 229, 234.) The claims were denied initially and upon reconsideration. (Tr. at 11, 49-52, 53, 54-57, 58, 61-63, 65-67.) On December 11, 2012, Claimant requested a hearing before an

---

[1] At the administrative hearing, Claimant amended his alleged onset date to October 31, 2011. (Tr. at 12, 14, 31-32.)

[2] Claimant filed a prior application for DIB on January 15, 2001. (Tr. at 12.) The claim was denied initially and upon reconsideration. (*Id.*) A hearing was held before an ALJ, and an unfavorable decision was entered by the ALJ on September 26, 2002. (*Id.*) The Appeals Council dismissed Claimant's request for review on January 8, 2003, and Claimant failed to seek any further appeal. (*Id.*)

Administrative Law Judge (ALJ). (Tr. at 11, 68-69.) A hearing was held on April 3, 2014, before the Honorable H. Munday. (Tr. at 112, 27-78.)   By decision dated June 6, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 12-22.) The ALJ's decision became the final decision of the Commissioner on April 1, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) Claimant filed the present action seeking judicial review of the administrative decision on May 26, 2015, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2014). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's

remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2014). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes

of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the amended alleged onset date, October 31, 2011. (Tr. at 14, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "degenerative disc disease and borderline intellectual functioning," which were severe impairments. (Tr. at 15, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 15, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity for light work, as follows:

> [T]he [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is occasionally able to balance, stoop, kneel, crouch, crawl, and climb. He may have occasional exposure to extreme heat, cold, humidity, and wetness; occasional exposure to vibrations; and occasional exposure to hazardous conditions, including unprotected heights and moving machinery. He is able to perform simple routine tasks.

(Tr. at 17, Finding No. 5.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 20, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ also concluded that Claimant could perform jobs such as a housekeeper, laundry bagger, and silver wrapper, at the unskilled, light level of exertion. (Tr. at 20-21, Finding No. 10.) On this basis, benefits was denied. (Tr. at 22, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying

5

the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, the Fourth Circuit Court of

Appeals defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular
> conclusion. It consists of more than a mere scintilla of evidence but may be
> somewhat less than a preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the

Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>,

495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by

substantial evidence.

<u>Claimant's Background</u>

Claimant was born on May 31, 1968, and was 45 years old at the time of the administrative

hearing on April 3, 2014. (Tr. at 21, 192.) The ALJ found that Claimant had a limited education and

was able to communicate in English. (Tr. at 21, 44-47, 233, 235.) In the past, he worked as an

equipment operator and mechanic helper. (Tr. at 20, 64-65, 235, 248-55.)

<u>The Medical Record</u>

The Court has considered all evidence of record, including the medical evidence and will

summarize it and discuss it below in relation to Claimant's arguments.

<u>*Evidence Prior to Amended Alleged Onset Date*</u>:

<u>*Physical Impairments*</u>:

Treatment notes from Dr. Rick Houdersheldt, M.D., dating back to 2000, reflect that

Claimant was diagnosed with GERD and back pain. (Tr. at 381-401.) An MRI scan of Claimant's

lumbar spine on March 10, 2000, demonstrated dehydrated L5-S1 disc without herniation or bulge. (Tr. at 394.) On July 7, 2000, x-rays of Claimant's lumbar spine demonstrated minimal osteoarthritis. (Tr. at 395.)

From August 15, 2000, through July 10, 2011, Claimant complained of right lower extremity pain, with numbness; lower back pain; nervousness; loss of sleep; and poor appetite. (Tr. at 322-30.) Lumbar spine x-rays on November 26, 2001, were normal. (Tr. at 340.) Claimant presented to Dr. Joseph H. Rapier, Jr., M.D., on December 11, 2003, with complaints of low back pain. (Tr. at 341-45.) Dr. Rapier noted that he had performed a prior orthopedic evaluation on December 12, 2000, at which time he opined that Claimant had a back strain that aggravated preexisting dormant degenerative changes of the lumbar spine, with signs of radiculopathy. (Tr. at 341.) On December 11, Dr. Rapier opined that Claimant was limited to lifting no more than ten pounds occasionally; should avoid repetitive frequent bending, lifting, turning, and twisting; and should avoid vibration, jars, and jolts. (Tr. at 345.)

Following an upper endoscopy on August 17, 2010, Claimant was diagnosed with reflux esophagitis and mild antral gastritis. (Tr. at 396-401.) On October 11, 2010, Claimant presented to Dr. Rick Houdersheldt, M.D., with complaints of back pain that were controlled with medication and indicated that his gastroesophageal reflux disease ("GERD") was helped some with medication. (Tr. at 385.) On November 16, 2011, Claimant reported increased back pain and right leg numbness. (Tr. at 380.)

*Mental Impairments*:

On December 11, 2000, Phil Pack, M.S., a certified clinical psychologist, conducted a psychological evaluation. (Tr. at 309-14.) Claimant reported that he was injured on September 14, 1999, when a bull dozer he was running suddenly dropped off a rock pile that jolted him and threw him against the dash. (Tr. at 309.) Claimant's injuries forced him to discontinue his employment as a

heavy equipment operator. (Tr. at 313.) Claimant reported that he quit school in the eleventh grade and that he had an approximate "C" average. (Tr. at 310.) Nevertheless, Claimant reported that he "never could read." (Id.) Intellectual functioning testing revealed a full scale IQ score of 86, which placed Claimant in the low average range of intellectual functioning, and a fourth grade reading level. (Tr. at 312.) Mr. Pack diagnosed pain and reading disorders. (Id.) He opined that Claimant's potential for vocational rehabilitation was significantly affected by his pain disorder and reading difficulties based on his report of "quite poor reading skills." (Tr. at 313.)

Mr. Pack also completed a form Medical Assessment of Ability to Do Work-Related Activities (Mental), on which he opined that Claimant had poor ability to understand, remember, and carry out complex job instructions. (Tr. at 319-21.) All other areas of mental functioning were rated good or fair. (Id.)

On April 24, 2001, Dr. David Shraberg, M.D., conducted a psychological evaluation and diagnosed Claimant with passive dependent personality features with symptom magnification and avoidance features and assessed a GAF of 80. (Tr. at 300-08.) Dr. Shraberg opined that Claimant had no permanent psychiatric impairments related to his September 14, 1999, bulldozer injury, that required treatment. (Tr. at 308.)

*Evidence From Relevant Period, October 31, 2011, through June 6, 2014*:

On August 31, 2012, Dr. Drew C. Apgar, J.D., D.O., F.C.L.M., conducted a consultative evaluation at the request of the State agency. (Tr. at 352-68.) Claimant reported that he was seeking disability based on chronic pain of his back and legs, degenerative disc disease, acid reflux, and illiteracy. (Tr. at 353.) He reported having been involved in a motor vehicle accident in September 1999, and a work-related accident, both of which resulted in back injuries. (Id.) He complained of chronic pain in his joints, back, and neck; low back pain with radiation and numbness of the right leg; a history of depression and anxiety; and an inability to read or write, with a ninth grade

education. (Tr. at 353-54.) Claimant took Hydrocodone to manage his chronic pain. (Tr. at 354.)

Regarding activities, Claimant reported that he watched television approximately 12 hours per day and neither was involved in church or clubs, nor attended any sports or recreational activities. (Tr. at 354-55.) On physical examination, Dr. Apgar observed that Claimant was able to get on and off the examination table with difficulty, maintained good posture while seated and standing, was able to move about the room, and dress and undress with difficulty. (Tr. at 356.) Examination of Claimant's neck was unremarkable. (Tr. at 358.) Examination of his upper extremities revealed intact manipulation, fine coordination, and pinch bilaterally; normal motor strength and sensation; intact grasp bilaterally, though right was less than left; an ability to perform rapid alternating hand movements without difficulty. (Tr. at 359-60, 363.) Upper extremity range of motion was normal with the exception of slight decreases in flexion, abduction, and right adduction of the shoulders. (Tr. at 366.) Examination of the lower extremities revealed hip instability, normal left lower extremity and 4/5 strength of the right lower extremity, intact sensation, a steady and deliberate but antalgic gait, and normal range of motion except significantly limited hip motion. (Tr. at 360, 363.) Claimant also had significantly decreased range of back motion. (Id.) Claimant was unable to walk on his heels or toes or heel to toe walk. (Tr. at 362.) He was able to squat and rise only half way and straight leg raise testing was positive on the right at 25 degrees and on the left at 47 degrees. (Id.)

Dr. Apgar diagnosed chronic pain syndrome; nonspecific arthrosis of the joints; lumbar spine myofascial pain versus degenerative disc disease; myofascial pain of the cervical spine; mild chronic obstructive pulmonary disease; anxiety and depression by history; and illiteracy by history. (Tr. at 362.) Dr. Apgar noted Claimant's reports of depression and noted that he was friendly, cooperative, and forthcoming; expressed unrestricted interests; displayed concern for maintaining current supportive relationships; demonstrated good hygiene and appearance; and demonstrated an awareness of means and willingness to improve his circumstances. (Tr. at 363-64.)

Dr. Apgar opined that based upon the objective findings, Claimant had difficulty "with sitting, standing, walking, traveling, lifting, carrying, pushing, pulling, but no difficulty with handling objects with the dominant hand, hearing, and speaking." (Tr. at 364.) He further opined that Claimant's mental status essentially was normal, that his understanding and memory were intact, that Claimant was able to maintain concentration and focus, and that his interaction and adaptation were appropriate to the needs of the exam. (Id.) Dr. Apgar found Claimant capable of managing his benefits. (Id.)

On March 5, 2012, Claimant presented to Dr. Rick Houdersheldt, M.D., with complaints of constant right leg throbbing, associated with numbness down the leg and into the toes. (Tr. at 379.) On July 9, 2012, Claimant complained of a small laceration on his right knee that was incurred when he was doing yard work. (Tr. at 378.) Claimant reported that the lower portion of his leg went numb and gave out on him. (Id.) Dr. Houdersheldt noted that although his right knee reflexes were diminished, he had no loss of sensation. (Id.) He diagnosed controlled chronic low back pain, GERD, and a knee injury with possible nerve involvement. (Id.)

On August 22, 2012, Claimant presented with complaints of chronic back and neck pain. (Tr. at 414.) He reported frequent falls due to back and leg pain at a greater intensity. (Id.) Claimant exhibited difficulty ambulating, right knee crepitus, positive right straight leg raising, decreased right leg sensation, and decreased range of hip motion. (Id.) Dr. Houdersheldt diagnosed back pain with lumbar radiculopathy. (Id.) An MRI scan of Claimant's lumbar spine on August 23, 2012, was normal. (Tr. at 415.) A Doppler of Claimant's bilateral lower extremities, on September 6, 2012, was unremarkable. (Tr. at 405.) On October 8, 2012, Claimant complained of back pain that was controlled with Hydrocodone, and GERD. (Tr. at 411.)

On February 25, 2013, Claimant telephoned Dr. Houdersheldt's office with complaints of sharp pain in his back that radiated to his right arm, associated with finger numbness. (Tr. at 412.)

Although he was advised to seek emergency treatment, Claimant reported that his symptoms had improved some and that he would wait until the next morning before going to the emergency room. (Id.)

On August 28, 2013, Claimant presented to Dr. Gregory D. Kelly, D.O., at CAMC Teays Valley Hospital, with complaints of a headache. (Tr. at 421-22.) Claimant reported that one month prior, he had tripped and fell and struck his head. (Tr. at 421.) He sustained a laceration, for which he did not seek medical treatment. (Id.) Since his injury, he suffered headaches, numbness on the top of his head, dizziness, and "blacking out." (Id.) Dr. Kelly observed that Claimant was alert, oriented, pleasant, cooperative, and anxious. (Id.) CT scans of Claimant's head were unremarkable. (Tr. at 416-17, 422.) Dr. Kelly diagnosed a concussion and abrasion of the right thigh and prescribed Bactrim, Dilaudid, and Lortab. (Tr. at 422.) Claimant was discharged in stable, ambulatory condition. (Id.)

Claimant returned to the hospital on September 4, 2013, with complaints of headaches with blurred vision, back pain, and dizziness. (Tr. at 418-20.) Claimant reported that he had run out of pain medication. (Tr. at 418.) Dr. M. Stephen Dillard, D.O., observed that Claimant was alert but covered his eyes as he appeared to have been in a mild amount of pain. (Tr. at 418.) Dr. Houdersheldt advised Dr. Dillard to administer a shot of Toradol. (Tr. at 419.) Claimant was diagnosed with nonspecific headaches and chronic back and leg pain. (Id.)

On March 10, 2014, Dr. Houdersheldt completed a form Physical RFC Assessment, on which he indicated that due to back and leg pain, Claimant had difficulty sleeping. (Tr. at 425-28.) He noted that pain medication temporarily eased his pain. (Tr. at 425.) Dr. Houdersheldt opined that Claimant's pain frequently interfered with his attention and concentration needed to complete even simple work tasks, but that he was capable of low stress jobs. (Tr. at 426.) The low stress level was due to Claimant's frequent level of pain. (Tr. at 427.) Dr. Houdersheldt opined that Claimant was

able to walk one block or less, could sit and stand for 20 minutes at a time but no more than two hours in an eight-hour day, and required ten minute periods of walking. (Id.)

*Mental Impairments*:

Mareda L. Reynolds, M.A., a licensed psychologist, performed a mental status examination and intellectual testing on September 4, 2012. (Tr. at 369-75.) Ms. Reynolds observed that Claimant ambulated with a slow gait and stooped posture and without any assistive devices. (Tr. at 369.) Claimant reported sadness, reduced appetite, difficulty sleeping due to pain, feelings of hopelessness, and problems with attention and concentration. (Tr. at 370.) He indicated that his primary care physician had treated him off and on for "nerves" since 2000. (Id.) He did not respond positively to an antidepressant and had some increased memory problems. (Id.) Claimant reported a tenth grade education, participation in regular education classes, and poor grades. (Tr.at 371.)

On mental status examination, Ms. Reynolds noted that Claimant easily established rapport and was cooperative, maintained good eye contact, exhibited appropriate social functioning, was alert and oriented, presented with a euthymic mood and broad and appropriate affect, exhibited normal speech and thought processes, had fair insight and adequate judgment, had normal immediate memory and adequate remote memory, and had normal persistence and pace, but had moderately deficient recent memory. (Tr. at 371-72.) Claimant reported his daily activities to have included watching television and driving occasionally. (Tr. at 372.) He did not complete household chores. (Id.) Claimant visited with others only occasionally and did not belong to any churches, clubs, or social organizations. (Id.)

Results of the WAIS-IV revealed a full scale IQ score of 64, and WRAT-4 testing revealed that Claimant performed spelling and math at a first grade level and read at a seventh grade level. (Tr. at 372-73.) Ms. Reynolds considered the results valid. (Tr. at 373.) She diagnosed depressive disorder NOS and borderline intellectual functioning, and opined that he had a fair prognosis and was

capable of managing any financial benefits. (Tr. at 373-74.)

On October 4, 2012, Dr. H. Hoback Clark, M.D., a reviewing State agency medical consultant, completed a Case Analysis, on which she opined that Claimant did not meet Listing 12.05C. (Tr. at 376.) Although Claimant had a valid full scale IQ score of 66, accompanied by a significant physical impairment, Dr. Clark found that he did not have deficits in adaptive functioning prior to the age of 22. (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in assigning no weight to the opinion of his treating physician, Dr. Houdersheldt. (Document No. 11 at 7-9.) Claimant notes that the ALJ rejected Dr. Houdersheldt's opinion because it was inconsistent with his treatment notes and the overall medical evidence of record, and because it lacked a legible signature. (Id. at 8.) Claimant asserts that these stated reasons were not "good reasons" as required by the Regulations and SSR 96-8p, and demonstrated the ALJ's failure to consider the requisite factors in weighing medical opinions. (Id.) Claimant asserts that the ALJ failed to identify any contrary evidence that justified her rejection of Dr. Houdersheldt's opinion, as required by SSR 96-8p. (Id.) He further asserts that the ALJ assigned little weight to Dr. Apgar's opinion, without any explanation. (Id. at 9.) Consequently, Claimant contends that the ALJ failed to comply with the applicable Regulations and Rulings in assigning little weight to Dr. Houdersheldt's opinion. (Id.)

In response, the Commissioner asserts that the evidence of record did not support the extensive restrictions assessed by Dr. Houdersheldt and that the ALJ's assignment of little weight to his opinion is supported by the substantial evidence of record. (Document No. 12 at 5-7.) The Commissioner notes that Claimant's back pain was controlled by medication and was not disabling. (Id. at 7.) The Commissioner therefore contends that the objective medical evidence of record failed

to establish limitations more restrictive than those assessed by the ALJ, and therefore, her assignment of little weight to Dr. Houdersheldt's opinion was supported by the substantial evidence of record. (Id.)

Claimant asserts in reply that the Commissioner's analysis is "nothing more than a *post hoc* rationale since the ALJ herself did not provide such an explanation in support of her own finding." (Document No. 13 at 1-2.) Citing 20 C.F.R. § 404.1527, Claimant asserts that the ALJ was required to indicate specifically the ways in which Dr. Houdersheldt's opinion was inconsistent with the record as a whole. (Id. at 2.) Claimant contends that the ALJ failed to consider the length, consistency, specialization and extent of Dr. Houdersheldt's opinion, as well as other evidence, including Dr. Apgar's opinion of marked limitations. (Id. at 3.) The ALJ therefore, failed to provide sufficient good reasons for giving Dr. Houdersheldt's opinion no weight. (Id. at 4.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to explain how she found Claimant literate and able to communicate in English, despite significant evidence that demonstrated Claimant's illiteracy. (Document No. 11 at 9-11.) As examples of his illiteracy, Claimant asserts that he consistently reported his inability to read; had several forms in support of his application for disability completed for him; achieved WRAT-4 test results that demonstrated third grade reading and spelling levels, with equally deficient math skills; required assistance with completing registration paperwork for Ms. Reynolds; and required at least two psychological assessments in 2000, by Dr. Shraberg due to his reading difficulty. (Id. at 10-11.) Claimant notes that Dr. Houdersheldt's treatment notes reflected his illiteracy and that the VE testified that an individual who reads and writes below the third grade level is considered functionally illiterate. (Id. at 11.) Claimant asserts that despite the ALJ's hypothetical question to the VE that included an individual with a tenth grade education, his numerical grade level was not dispositive of his educational abilities. (Id.) He contends that pursuant

to Medical-Vocational Rule 201.17, given his education and limitation to sedentary work, an award of benefits was warranted. (<u>Id.</u>) Accordingly, Claimant contends that the ALJ's error was not harmless and that remand is appropriate. (<u>Id.</u>)

In response, the Commissioner asserts that Claimant's argument that he would have been disabled pursuant to Medical-Vocational Rule 201.17, is without merit. (Document No. 12 at 7-8.) The Commissioner asserts that because the ALJ properly assigned no weight to Dr. Houdersheldt's opinion, the ALJ properly found that Claimant was capable of performing light exertional level work. (<u>Id.</u> at 7-8.) Consequently, the Commissioner contends that Claimant would not have been found disabled under the Medical-Vocational Rules, even if he were illiterate. (<u>Id.</u> at 8.)

<u>Analysis</u>.

1. *<u>Treating Opinion</u>*.

Claimant first alleges that the ALJ erred in failing to assign any weight to the opinion of his treating physician, Dr. Houdersheldt. (Document No. 11 at 7-9.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2014). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." <u>Id.</u> §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source

15

treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2014). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2014). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2012). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2014). Ultimately, it is the responsibility of the Commissioner,

16

not the court to review the case, make findings of fact, and resolve conflicts of evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In his decision, the ALJ assigned no weight to Dr. Houdersheldt's opinion because it was inconsistent with his treatment notes and the overall medical evidence, and it lacked a legible signature. (Tr. at 19-20.) To the extent that the ALJ discounted Dr. Houdersheldt's opinion because it contained an illegible signature, the undersigned finds that the ALJ's decision is not supported by the substantial evidence. There is no question in the record as to whether or not Dr. Houdersheldt signed the assessment. This reason therefore, is not a "good reason" within the meaning of the Regulations and Rulings. Claimant correctly notes that the ALJ did not specifically pinpoint in the paragraph devoted to weight, the ways in which Dr. Houdersheldt's opinion was inconsistent with his treatment notes and the overall medical evidence. Nevertheless, in the two preceding paragraphs, the ALJ specifically acknowledged Dr. Houdersheldt's diagnoses of chronic low back pain controlled, GERD controlled, and knee injury with possible nerve involvement. (Tr. at 18, 378.) He acknowledged essentially normal examination findings by Dr. Apgar, unremarkable MRI and Doppler findings, and Dr. Houdersheldt's note that Claimant's back pain was controlled with hydrocodone. (Tr. at 18, 362-64, 405, 411, 415.) Contrary to Claimant's allegation, the ALJ acknowledged that Dr. Houdersheldt was Claimant's treating physician and specifically mentioned radiological testing

he ordered in March and June 2000. (Tr. at 18, 394-95.) Nevertheless, the undersigned finds that the ALJ failed to appreciate the length of Dr. Houdersheldt's treating relationship with Claimant. Dr. Houdersheldt was Claimant's treating physician for nearly 15 years and made personal observations of Claimant's demeanor throughout that time. Furthermore, despite normal examination findings, Dr. Houdersheldt's opinions were consistent with Claimant's continued complaints of right leg numbness, and pain in his hips, shoulder, and lumbar spine. Dr. Houdersheldt even acknowledged Claimant's report of "crippling back pain" at one point. Furthermore, as the ALJ noted, Dr. Houdersheldt diagnosed degenerative disc disease in March 2014. (Tr. at 19.) To the extent therefore, that the ALJ failed to give Dr. Houdersheldt's opinion any weight, the undersigned finds that such finding was in error. At the least, there was supportability of Claimant's consistent subjective complaints and Dr. Houdersheldt's opinions.

Claimant also asserts that the ALJ failed to consider Dr. Apgar's assessed marked limitations. (Document No. 13 at 3.) The ALJ specifically acknowledged Dr. Apgar's assessed marked difficulties with sitting, standing, walking, traveling, lifting, carrying, pushing, and pulling, and accorded his opinion little weight as it was inconsistent with his own examination findings and the overall medical evidence of record. (Tr. at 20.) The ALJ summarized Dr. Apgar's findings which essentially were unremarkable, with the exception of slightly diminished strength of the right lower extremity, an antalgic gait that did not require assistive devices, and only reduced range of motion of the hips, shoulder, and lumbar spine. (Tr. at 18, 358-63.) Dr. Apgar's findings therefore, were inconsistent with his assessed marked limitations. For the same reasons discussed above, Dr. Apgar's limitations also were inconsistent with the overall medical evidence of record. The undersigned therefore finds that the ALJ's decision to give little weight to Dr. Apgar's opinion is supported by the substantial evidence of record.

18

Accordingly, based on the foregoing, the undersigned finds that the ALJ's decision to give no weight to the opinion of Dr. Houdersheldt was made in error and that the matter should be remanded for further consideration of the opinion evidence.

2.  *Educational Level*.

Claimant also alleges that the ALJ erred in finding that he was literate and able to communicate in English. (Document No. 11 at 9-11.) In this case, the ALJ found that Claimant had a limited education and was able to communicate in English. (Tr. at 21, Finding No. 8.) A limited education is defined as "ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in the semi-skilled or skilled jobs." 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3). The ALJ found that Claimant had borderline intellectual functioning based upon Ms. Reynolds's findings of moderate deficits in attention and concentration, as well as a full scale IQ score of 64. (Tr. at 15, 19, 371-73.) The ALJ acknowledged the testing by Ms. Reynolds, which demonstrated that Claimant had a kindergarten reading level and a first grade spelling and math level. (Tr. at 19.) He also acknowledged however, that Mr. Pack's intellectual testing in 2000, demonstrated a full scale IQ of 86, and a fourth grade reading level. (Tr. at 19, 312.) The ALJ further acknowledged that Claimant's past relevant work consisted of both semi-skilled and skilled work. (Tr. at 20-21.)

As Claimant asserts, the ALJ failed to acknowledge that he was placed in special education classes when in school and that he required assistance in completing several forms as part of the application process for benefits. (Document No. 11 at 10-11.) In questioning the VE, the ALJ asked the VE to consider a person of Claimant's education, which he previously indicated was a tenth grade education.[4]  (Tr. at 63, 65.) The VE identified unskilled jobs that such an individual could

---

[4] The Regulations state that the importance of a claimant's educational level "may depend upon how much time has passed between the completion of your formal education and the beginning

perform. (Tr. at 64-68.) Upon questioning by counsel, the VE indicated that a third grade reading level was considered functionally illiterate and that an individual reading at the fourth grade level would have some significant reading issues. (Tr. at 70-71.) Thus, for an individual limited to sedentary, simple and unskilled work with a sit-stand option, who performed reading at a second grade level, the VE testified that there were no jobs that existed in significant numbers in the national economy. (Tr. at 73.) When the hypothetical was changed to light exertion work, the VE testified that such an individual would be able to perform the jobs of a silverware wrapper, ticket seller, and night patrolman. (Tr. at 73-74.) Upon questioning by counsel, the VE further testified that if an individual was unable to maintain attention and concentration for twenty percent of the workday, he was unable to maintain substantial gainful employment. (Tr. at 75.)

In his decision, the ALJ found that Claimant was capable of performing light exertional level work that involved simple, routine tasks. (Tr. at 17.) Regardless of the ALJ's stated educational level, his decision is consistent with the VE's testimony that an individual limited to light, simple, and unskilled work, with a sit-stand option and second grade reading level was able to perform the identified jobs. Furthermore, contrary to Claimant's allegation, Medical-Vocational Rule 201.17 is inapplicable because the ALJ found that Claimant was capable of performing light exertional level work. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.17 (2014).

---

of your physical or mental impairment(s) and by what you have done with your education in a work or other setting." 20 C.F.R. §§ 404.1564(b), 416.964(b) (2014). The Regulations further state that educational abilities may not be representative of a claimant's formal education, and may be "higher or lower," if achieved many years before the impairment began. *Id.* The ALJ will use a claimant's grade level to determine educational abilities unless there is other evidence to contradict it. Id. The Regulations further define education to include how well a claimant is able to communicate in English. *Id.* As Claimant notes, illiteracy is defined in the Regulations as "the inability to read or write." 20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1). A claimant is considered illiterate under the Regulations when "the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." *Id.* In general, an illiterate person "has had little or no formal schooling." *Id.*

Leaving constant all criteria except the light exertional level, Medical-Vocational Rule 202.16 directs a finding of not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.16 (2014). Accordingly, the undersigned finds that Claimant's allegations regarding his inability to read and write and the ALJ's findings pertaining thereto, are without merit and that the ALJ's decision is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 12.), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. 405(g) for further administrative proceedings for further consideration of the opinion evidence of record, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155, 106

S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Chief Judge Chambers, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: May 25, 2016.

Omar J. Aboulhosn
United States Magistrate Judge

22